**STATE of Missouri ex rel. CARTER COUNTY, Missouri, and C. P. Turley, Prosecuting Attorney of Carter County, Plaintiffs-Respondents,**

**v.**

**Roy LEWIS and Sophia Lewis, Defendants-Appellants.**

**No. 7498.**

Springfield Court of Appeals.

Missouri.

Aug. 27, 1956.

Henson & Henson, Poplar Bluff, for defendants-appellants.

C. P. Turley, Van Buren, for plaintiffs-respondents.

STONE, Judge.

In this action for a mandatory injunction to compel removal of all obstructions from an alleged public road in Carter County, Missouri, and to enjoin future ob-

struction of the road, defendants appeal from a decree granting the requested injunctive relief. The segment of road in dispute (hereinafter referred to as the disputed road) is approximately 1,866 feet in length and runs in an irregular northerly and southerly course from the south edge of the country community of Chilton, Missouri, to the north bank of Current River. In earlier times, the disputed road forked near the river, with one branch running upstream and crossing Current River at the Partney Ford, and with the other branch running downstream and crossing Current River at the Swezea Ford. There was no showing that either ford, or for that matter either branch of the road past the fork, had been used for more than ten years prior to trial, but the evidence definitely established that all who had occasion to do so had continued to travel the disputed road to the north bank of Current River until the Fall of 1953.

For many years (and until 1949, as the testimony indicated), children of school age residing on the south side of Current River were transported across the river by boat to a landing near the fork in the disputed road and walked over that road to the Chilton school, and similarly adults living on the south side of Current River crossed the river by boat and used the disputed road as the only available route to the polling place for school and general elections. With the formation of consolidated school districts and the construction of improved state highways on the south side of Current River, use of the disputed road for the foregoing purposes has diminished in recent years. However, at least one student attending Ellsinore High School continued to cross Current River and to use the disputed road regularly during the school year of 1949–1950, and residents on the south side of the river continued to use this road, after crossing the river by boat, to participate in school elections and to reach Chilton for other purposes. And, there was uninterrupted, and apparently unabated, vehicular use of the disputed road—"the only road leading in there in that section of the county"—by those who went to Current River for fishing, swimming and other recreational purposes, as well as by residents of the Chilton community desiring to visit the neighborhood cemetery about one mile downstream on the south side of the river. Defendant, Roy Lewis, who moved onto the farm, through which the disputed road runs, in 1940 as manager for one Waymeyer, from whom defendants subsequently purchased the farm in November, 1951, readily conceded the constant and continuing use of the disputed road during the entire period of his residence on the farm. In short, the evidence abundantly supported the finding of the learned trial chancellor that "the use of said road by the public has been constant, general and continuous since its establishment in pioneer days, some fifty or more years ago, down to the present time."

Witness Hampton, 77 years of age at the time of trial, who had been road overseer of the Chilton district from 1910 to 1922, testified positively that he had worked the disputed road (which was in the Chilton district) during each of the twelve years he had been road overseer, and he also remembered that his father (in a capacity not shown) had worked the disputed road "when I was just a boy." Witness Chilton, who had lived in the neighborhood from 1910 to 1928, had worked out his poll tax on the disputed road "quite a few years" during that period, and three other witnesses either had worked out their poll taxes or had observed others working out such taxes on the disputed road at various times, the latest year specifically designated having been 1934. Witness Coleman, identified as "an operator of the road machinery * in Carter County," stated that he had "machined" the disputed road "several times," the last such occasion having been in 1942; and, when asked whether there had been "any public money expended or any public work performed" on the disputed road after 1940, defendant,

Roy Lewis, said that "in 1942 they run a grader over it"—"that was the *last* time."

In 1948 or 1949, a cattle guard was installed across the north end of the disputed road, with a gate at the side to admit those riding on horseback or driving teams. The evidence was conflicting as to whether defendant, Roy Lewis, *personally* requested permission of the County Court of Carter County to install the cattle guard and gate; but, in any event, Lewis was present when either he or Waymeyer (depending upon whose version of the matter be accepted) sought and obtained such permission. The initially professed purpose of installing the cattle guard and gate, thus closing the east-and-west fence line along the north side of the bottom fields in the Waymeyer farm, was to relieve Waymeyer and his then manager, defendant Lewis, of continued maintenance of the north-and-south fences along the disputed road, which segregated and separated the road from the adjoining fields; and, there was no interference with free public use of the disputed road until the Fall of 1953 when Lewis told the County Highway Engineer, then proposing to grade the road, "to keep out" and shortly thereafter erected "no trespassing" signs, and locked a gate across the north end of the road, in defiance of an order of the County Court entered on December 7, 1953, which directed him to remove all obstructions from the road. Parenthetically, we note the puzzling and paradoxical testimony of defendant Lewis who, on the one hand, claimed the disputed road as his own but, on the other hand, denied any *prior* refusal of the right to use this road and disavowed any intention to restrict its *future* use—"I don't intend to try to stop anybody."

The trial chancellor found that the disputed road is a legally established public road under that portion of Section 228.190 which provides that "all roads that have been used as such by the public for ten years continuously, and upon which there shall have been expended public money or labor . for such period, shall be deemed legally established roads." (Except as otherwise shown, all statutory references herein are to RSMo 1949, V.A.M.S.; and, all references to Section 228.190 are to that statute as amended Laws of 1953, p. 674.) To establish a public road under the quoted statutory provision, it is not necessary to prove constant expenditure of public money or labor or, for that matter, expenditure thereof "each and every year for such 10-year period" [Garbee v. St. Louis-San Francisco Ry. Co., 220 Mo.App. 1245, 1256, 290 S.W. 655, 658]; but, it is sufficient to show that the expenditure of public money or labor began and "continued from time to time for the period of limitation, as (reasonably) might be considered necessary or expedient by those in authority". [State v. Macy, 72 Mo.App. 427, 432; State v. Kitchen, 205 Mo.App. 31, 37, 216 S.W. 981, 983] and that such expenditure was sufficient to maintain the road "in substantial repair and condition for * * * public travel." State v. Kitchen, supra, 216 S.W. loc.cit. 984. See also Anderson v. Birkeland, 229 Minn. 77, 38 N.W.2d 215, 218(5); Town of Wells v. Sullivan, 125 Minn. 353, 147 N.W. 244, 245(4); Hansen v. Town of Verdi, 83 Minn. 44, 85 N.W. 906. In the instant case, there was definite, specific and uncontroverted evidence that the then road overseer of the Chilton district had worked the disputed road each year from 1910 to 1922, and other evidence, likewise undenied, of subsequent expenditure of public money or labor from time to time until 1942. That the disputed road was maintained, throughout that entire period, in a state of substantial repair for public travel is fairly inferable from the undisputed testimony that, in fact, the public did travel the road continuously and without interruption or difficulty. The finding of the trial chancellor that the disputed road became a legally established public road under the above-quoted provision of Section 228.190 was based upon substantial evidence and should not be disturbed on

this appeal. Section 510.310(4); Wann v. Gruner, Mo., 251 S.W.2d 57, 59(1, 2).

Upon trial of the instant case, defendants emphasized that no public money or labor had been expended on the disputed road since 1942. But, when that road became a legally established public road, long prior to 1942, by virtue of public use as such for ten years continuously and expenditure of public money or labor thereon for such period [Section 228.190], the right to use it as a public highway became vested in, and inured to the benefit of, the public [Oetting v. Pollock, 189 Mo.App. 263, 271, 175 S.W. 222, 224]; and, absent vacation in a statutory proceeding under Chapter 228, such right of use thereafter could not have been divested except upon abandonment of the disputed road for *"nonuser by the public"* for the period specified by statute, to-wit, now "five years continuously" [Section 228.190] but, prior to 1953, "ten years continuously." Section 8485, RSMo 1939; Section 7839, RSMo 1929; Section 10635, RSMo 1919.

That, in the instant case, there may have been an abandonment of both branches of the road beyond the fork on the north bank of Current River does not, per se, constitute an abandonment of the disputed road from the south edge of Chilton to the fork in the road [Proctor v. Proctor, 222 Mo.App. 21, 4 S.W.2d 882, 888] even though the disputed road now has no outlet to the south and thus is a cul-de-sac [Sterlane v. Fleming, 236 Iowa 480, 18 N.W.2d 159, 161(2); 39 C.J.S., Highways, § 131, a, loc.cit. 1067—consult Kansas City v. Missouri Pac. Ry. Co., Mo., 229 S.W. 771, 774–775; Wann v. Gruner, supra, 251 S.W.2d loc.cit. 58; Patton v. Forgey, 171 Mo.App. 1, 4, 153 S.W. 575, 576]; and, that travel on the disputed road may have decreased in recent years does not work an abandonment thereof [Oetting v. Pollock, supra, 189 Mo.App. loc.cit. 271, 175 S.W. loc.cit. 224; Littlejohn v. Corey, 254 Mich. 111, 235 N.W. 809] nor affect its

status as a public road so long as there are those of the public who desire to use, and do use, it. Consult Gilleland v. Rutt, Mo. App., 63 S.W.2d 199, 202(8); Wallach v. Stetina, Mo.App., 28 S.W.2d 389, 390–391(2); Phelps v. Dockins, Mo.App., 234 S.W. 1022, 1023(4); Dow v. Kansas City Southern Ry. Co., 116 Mo.App. 555, 558, 92 S.W. 744, 745(2). The right to use a public road "cannot be surrendered or abandoned, unless all of the public concur therein" [Oetting v. Pollock, supra, 189 Mo.App. loc.cit. 271, 175 S.W. loc.cit. 224], and the loss of such right of use may result only "from the acts and doings of the parties entitled to the highway, and not from the adversary or hostile possession of others." Johnson v. Rasmus, 237 Mo. 586, 592, 141 S.W. 590, 591; McEneny v. Gerlach, Mo. App., 142 S.W.2d 1095, 1098(2). Since the record before us convincingly demonstrates that uninterrupted public travel over the disputed road continued until defendants obstructed it in the Fall of 1953, defendants utterly failed to carry the burden, which is cast upon those asserting abandonment of a public road [Rosendahl v. Buecker, Mo.App., 27 S.W.2d 471, 472(4); 25 Am.Jur., Highways, Section 47, p. 365], to show such abandonment by clear and cogent proof [McEneny v. Gerlach, supra, 142 S.W.2d loc.cit. 1098—see also Purvis v. Busey, 260 Ala. 373, 71 So.2d 18, 21(5); 39 C.J.S., Highways, § 130, loc.cit. 1066]; and the finding of the trial chancellor that the disputed road had not been abandoned plainly was proper.

We need not, and do not, determine whether the trial chancellor erred, as defendants assert, in admitting testimony that Waymeyer had requested permission of the County Court of Carter County for construction of the cattle guard at the north end of the disputed road. Where, as here, the entire record in an equity case is before us, it is unnecessary to rule questions of alleged error in the admission or rejection of evidence [Hussey v. Robison, Mo., 285 S.W.2d 603, 604(1); Kramer v. John-

son, 361 Mo. 1085, 1095, 238 S.W.2d 416, 421–422(6); Middleton v. Reece, Mo., 236 S.W.2d 335, 341(1)], for, in our review of the case de novo, we consider such evidence in the record as we deem admissible, excluding from consideration all evidence improperly received and reaching our conclusion on the competent evidence offered. Bowman v. Kansas City, 361 Mo. 14, 20, 233 S.W.2d 26, 29(1); Farr v. Lineberger, Mo., 207 S.W.2d 455, 459(7); Kerr v. Prudential Ins. Co. of America, 238 Mo.App. 972, 194 S.W.2d 706, 709(2,3). Without regard to the evidence of which defendants complain, the decree of the trial court was altogether correct and should be affirmed. It is so ordered.

McDOWELL, P. J., and RUARK, J., concur.